UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK ATKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:21-cv-291 |
| MERRICK B. GARLAND, in his official | ) | |
| capacity as Attorney General of the United | ) | |
| States, and STEVEN DETTELBACH, in his | ) | |
| official capacity as Director of the Bureau of | ) | |
| Alcohol, Tobacco, Firearms and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    I.     Statutory Background ................................................................................................ 2

    II.    Factual Background ................................................................................................... 3

    III.   Procedural Background ............................................................................................. 3

LEGAL STANDARDS ........................................................................................................... 5

ARGUMENT .......................................................................................................................... 5

    I.     Binding Precedent Establishes That Section 922(g)(1) Is Facially Constitutional. ....... 6

    II.    Felons, As A Class, Are Not Among "The People" Protected By The Second
         Amendment. ............................................................................................................. 9

    III.   History And Tradition Confirm That Congress May Disarm Felons, Including
         Atkinson, On A Categorical Basis ........................................................................... 12

         A.     Founding-Era Criminal Punishments More Severe Than Disarmament ....... 13

         B.     Founding-Era Laws Disarming Convicted Criminals ................................. 16

         C.     Longstanding And Widespread Felon-Disarmament Laws .......................... 19

         D.     Laws Disarming Dangerous Persons On A Categorical Basis ..................... 22

    IV.   To The Extent That As-Applied Challenges To Section 922(g)(1) May Be
         Available, Atkinson's Challenge Fails In Light Of The Seriousness Of Felony
         Fraud And The Dangerousness Of Even Non-Violent Felons. .................................. 26

    V.    The Supreme Court's Decision In *Rahimi* Reinforces This Court's Analysis In
         *Donald* And Other Recent Cases Rejecting Second Amendment Challenges To
         Section 922(g)(1), Including As Applied To Non-Violent Felons. .............................. 28

CONCLUSION ..................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Adoptive Couple v. Baby Girl,*
  570 U.S. 637 (2013) ...........................................................................................................17

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019) ............................................................................................................21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................................5

*Atkinson v. Garland,*
  70 F.4th 1018 (7th Cir. 2023)..............................................................................1, 4, 12, 13

*Austin v. United States,*
  509 U.S. 602 (1993) ..........................................................................................................14

*Avery v. Everett,*
  18 N.E. 148 (N.Y. 1888) ...................................................................................................15

*Beauharnais v. Illinois,*
  343 U.S. 250 (1952) ..........................................................................................................18

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................................4

*Binderup, v. Att'y Gen.,*
  836 F.3d 336 (3d Cir. 2016) ..............................................................................................25

*Blanton v. City of North Las Vegas,*
  489 U.S. 538 (1989) ..........................................................................................................25

*Branzburg v. Hayes,*
  408 U.S. 665 (1972) ..........................................................................................................25

*Bucklew v. Precythe,*
  587 U.S. 119 (2019) ....................................................................................................14, 16

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  596 U.S. 61 (2022) ............................................................................................................21

*Cruzan v. Dir., Mo. Dep't of Health,*
  497 U.S. 261 (1990) ..........................................................................................................18

*Dep't of Revenue v. Davis,*
  553 U.S. 328 (2008) ..........................................................................................................22

*Dickerson v. New Banner Inst., Inc.*,
460 U.S. 103 (1983) .......................................................................................................25

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...................................................................................................*passim*

*Doe v. Reed*,
561 U.S. 186 (2010) .......................................................................................................22

*Green v. Bd. of Elections*,
380 F.2d 445 .................................................................................................................11

*Green v. United States*,
356 U.S. 165 .................................................................................................................17

*Hamilton v. Pallozzi*,
848 F.3d 614 (4th Cir. 2017) .........................................................................................27

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ......................................................................................7

*Jordan v. De George*,
341 U.S. 223 (1951) .......................................................................................................26

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008) .......................................................................................27

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) .........................................................................................26

*Lewis v. United States*,
445 U.S. 55 (1980) .........................................................................................................25

*Lewis v. United States*,
518 U.S. 322 (1996) .......................................................................................................25

*Logan v. United States*,
552 U.S. 23 (2007) ...........................................................................................................3

*Long v. Bowen*,
23 S.W. 343 (Ky. 1893) .................................................................................................10

*McCauley v. City of Chicago*,
671 F.3d 611 (7th Cir. 2011) ...........................................................................................5

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .........................................................................................................8

*McIntyre v. Ohio Election Comm'n*,
    514 U.S. 334 (1995) ........................................................................................22

*Medina v. Whitaker*,
    913 F.3d 152 (D.C. Cir. 2019) ............................................................ 12, 26

*Nev. Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ........................................................................................21

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ........................................................................................21

*NYSRPA v. Bruen*,
    597 U.S. 1 (2022) .................................................................................*passim*

*NYSRPA v. City of New York*,
    140 S. Ct. 1525 (2020) ......................................................................................7

*Ramos v. Louisiana*,
    590 U.S. 83 (2020) ............................................................................................7

*Richardson v. Ramirez*,
    418 U.S. 24 (1974) ..........................................................................................11

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) .......................................................................................7, 8

*Spencer v. Kemna*,
    523 U.S. 1 (1998) ............................................................................................12

*State v. Hogan*,
    58 N.E. 572 (1900) ........................................................................................24

*State v. Shelby*,
    2 S.W. 468 (1886) ..........................................................................................24

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ........................................................................5

*Troup v. Wood*,
    4 Johns. Ch. 228 (N.Y. Chancery 1820) ....................................................15

*Tyler* v. *Cain*,
    533 U.S. 656 (2001) ..........................................................................................7

*United States v. Barton*,
    633 F.3d 168 (3d Cir. 2011) ..........................................................................24

*United States v. Bean,*
   537 U.S. 71 (2002) ........................................................................................................28

*United States v. Classic,*
   313 U.S. 299 (1941) ......................................................................................................11

*United States* v. *Cortez-Gomez,*
   No. 20-CR-422, 2024 WL 2019267 (N.D. Ill. May 6, 2024) ....................................1

*United States* v. *Cunningham,*
   70 F.4th 502 (8th Cir. 2023) ................................................................................. 6, 12

*United States v. Donald,*
   No. 20-CR-832, 2024 WL 2018630 (N.D. Ill. May 6, 2024) ............................*passim*

*United States* v. *Dubois,*
   94 F.4th 1284 (11th Cir. 2024) ............................................................................. 6, 12

*United States* v. *Everist,*
   368 F.3d 517 (5th Cir. 2004) ......................................................................................24

*United States v. Gay,*
   98 F.4th 843 (7th Cir. 2024) ........................................................................... 6, 26, 29

*United States* v. *Greenlee,*
   No. 22-CR-403, 2024 WL 2019279 (N.D. Ill. May 6, 2024) ....................................1

*United States* v. *Haskell,*
   26 F. Cas. 207 (C.C.E.D. Pa. 1823) ..........................................................................10

*United States* v. *Jackson,*
   69 F.4th 495 (8th Cir. 2023) ................................................................................. 6, 12

*United States v. Jimenez-Shilon,*
   34 F.4th 1042 (11th Cir. 2022) ....................................................................................5

*United States* v. *Johnson,*
   No. 20-CR-926, 2024 WL 2019541 (N.D. Ill. May 6, 2024) ....................................1

*United States* v. *Leverston,*
   No. 22-CR-532, 2024 WL 2018279 (N.D. Ill. May 6, 2024) ....................................1

*United States* v. *McIntosh,*
   No. 21-CR-188, 2024 WL 2018277 (N.D. Ill. May 6, 2024) ....................................1

*United States* v. *Nathaniel,*
   No. 20-CR-399, 2024 WL 2018615 (N.D. Ill. May 6, 2024) ....................................1

*United States* v. *Phillips*,
No. 1:22-CR-00596, 2023 WL 9001124 (N.D. Ill. Dec. 28, 2023).................................. 6, 12

*United States v. Rahimi*,
144 S. Ct. 1889 (2024)..............................................................................................*passim*

*United States v. Rosario*,
No. 21-CR-169, 2024 WL 2018937 (N.D. Ill. May 6, 2024) ................................................1

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010), *cert. denied,* 562 U.S. 1303 (2011) .................................. 19, 22

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) .........................................................................................................9

*United States* v. *Walls*,
No. 20-CR-710, 2024 WL 2018624 (N.D. Ill. May 6, 2024) ............................................1

*United States* v. *Whitney*,
No. 22-10326, 2024 WL 1429461 (9th Cir. Apr. 3, 2024) .............................................. 6, 12

*Vidal v. Elster*,
602 U.S. 286 (2024) .......................................................................................................22

*Vincent* v. *Garland*,
80 F.4th 1197 (10th Cir. 2023) ...................................................................................... 6, 12

*Voisine v. United States*,
579 U.S. 688 (2016) .........................................................................................................8

**Constitutional Provisions**

U.S. Const. amend. V...........................................................................................................25

U.S. Const. amend. XIV .......................................................................................................11

U.S. Const. art. I..................................................................................................................11

**Statutes**

1 Mo. Rev. Stat....................................................................................................................23

10 Guam Code Ann. § 60108...............................................................................................20

13 Vt. Stat. Ann. § 4017......................................................................................................20

18 U.S.C. § 921....................................................................................................................2

18 U.S.C. § 922 .................................................................................................................... *passim*

18 U.S.C. § 925 ............................................................................................................................ 2

18 U.S.C. § 1341 ....................................................................................................................... 1, 3

720 Ill. Comp. Stat. 5/24-1.1 ...................................................................................................... 20

Ala Code § 13A-11-72 ................................................................................................................. 20

Alaska Stat. Ann. § 11.61.200 ..................................................................................................... 20

Ariz. Rev. Stat. Ann. § 13-904 .................................................................................................... 20

Ark. Code Ann. § 5-73-103 .......................................................................................................... 20

Cal. Penal Code § 29800 .............................................................................................................. 20

Colo. Rev. Stat. Ann. § 18-12-108 .............................................................................................. 20

Conn. Gen. Stat. § 53a-217 .......................................................................................................... 20

D.C. Code Ann. § 22-4503 ........................................................................................................... 20

Fla. Stat. Ann. § 790.23 ............................................................................................................... 20

Ga. Code Ann. § 16-11-131 ......................................................................................................... 20

Haw. Rev. Stat. § 134-7 ............................................................................................................... 20

Ind. Code Ann. § 35-47-2-3 ......................................................................................................... 20

Iowa Code Ann. § 724.26 ............................................................................................................. 20

Kan. Stat. Ann. § 21-6304 ........................................................................................................... 20

Ky. Rev. Stat. Ann. § 527.040 ..................................................................................................... 20

La. Stat. Ann. § 14:95.1 ............................................................................................................... 20

Mass. Gen. Laws Ann. ch. 140 .................................................................................................... 20

Md. Code Ann. Pub. Safety §§ 5-101 .......................................................................................... 20

Mich. Comp. Laws Ann. § 750.224f ........................................................................................... 20

Minn. Stat. Ann. § 624.713 .......................................................................................................... 20

Miss. Code Ann. § 97-37-5 ................................................................................................................20

Mo. Rev. Stat. § 571.070.1 ..............................................................................................................20

Mont. Code Ann. § 45-8-313 ..........................................................................................................20

N.C. Gen. Stat. Ann. § 14-415 .......................................................................................................20

N.H. Rev. Stat. Ann. § 159:7 .........................................................................................................20

N.J. Stat. Ann. § 2C:58-3 ................................................................................................................20

N.M. Stat. Ann. § 30-7-16 ..............................................................................................................20

N.Y. Penal Law § 400.00 .................................................................................................................20

Or. Rev. Stat. Ann. § 166.270 ........................................................................................................20

Pub. L. No. 87-342 ............................................................................................................................19

Pub. L. No. 90-618 ...............................................................................................................2, 20, 23

Pub. L. No. 95-351 ..............................................................................................................................2

Pub. L. No. 99-308 ............................................................................................................................23

Pub. L. No. 104-208 ..........................................................................................................................24

S.C. Code Ann. § 16-23-30 .............................................................................................................20

S.D. Codified Laws § 22-14-15 ......................................................................................................20

Tenn. Code Ann. § 39-17-1307 .....................................................................................................20

Tex. Penal Code Ann. § 46.04 ........................................................................................................20

Utah Code Ann. § 76-10-503 .........................................................................................................20

W. Va. Code Ann. § 61-7-7 .............................................................................................................20

Wyo. Stat. Ann. § 6-8-102 ..............................................................................................................20

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................................................4

**Regulations**

27 C.F.R. § 478.144.................................................................................................................2

**Other Authorities**

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) .....................................................23

1 William Blackstone, *Commentaries on the Laws of England* 300 (10th ed. 1787)........................................11

2 Joseph Story, *Commentaries on the Constitution of the United States*, § 578 (1833) ....................................10

2 Noah Webster, *An American Dictionary of the English Language* (1828) ...................................9

2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); ..............................9

2 *The Documentary History of the Ratification of the Constitution* (Merrill Jensen ed., 1976) .........................17

3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1890 (1833) ....................................9

3 William Blackstone, *Commentaries on the Laws of England* 363-364 (10th ed. 1787).............................12

4 William Blackstone, *Commentaries on the Laws of England* 382 (10th ed. 1787).........................11, 14, 15

37 *Annals of Cong.* 86-87 (Dec. 9, 1820)........................................................10

1897 Tex. Gen. Laws 221 .......................................................................23

*Act of 1777, ch. 6, § 9, in 24 The Records of North Carolina (Walter Clark ed., 1905)* ....................................10

Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1................................23

Act of Apr. 6, 1936, No. 82, § 4, 1936 Ala. Gen. Laws 51 ...............................20

Act of Apr. 8, 1881, ch. 548, § 1, Del. Laws 716 (1881) ...............................23

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ...............................23

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ..........................23

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 .........................................23

Act of Apr. 22, 1927, ch. 1052, § 3, 1927 R.I. Acts & Resolves 257 ...........................20

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 .............................23

Act of Apr. 27, 1927, No. 206, § 4, 1927 Haw. Terr. Sess. Laws 209 ...........................20

Act of April 30, 1790, ch. 9, § 14, 1 Stat. 115 .................................................................14

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34.................................................................23

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170 .................................................23

*Act of Dec. 1775, in The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive (Charles J. Hoadly ed., 1890)*.................................................................*17*

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 .....................................................23

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87 ....................................23

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14............................................23

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ...............................................23

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ....................................23

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.........................................23

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1 .................................23

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 ..................................................23

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ............................................. 23

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39.......................................................23

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) ................................................23

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144......................................23

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112.......................................................23

Act of June 10, 1931, No. 158, § 4, 1931 Pa. Sess. Laws 498......................................20

Act of June 12, 1879, § 2, Ohio Laws 192 ...................................................................23

Act of June 13, 1777, ch. 756, § 3, *in 9 The Statutes at Large of Pennsylvania from 1682 to 1801*, (James T. Mitchell & Henry Flanders eds., 1903).................................................................10

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ...................................................23

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274......................................23

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159......................................23

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 ..................................................23

Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380 ........................................................20

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ..............................................23

Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495 .......................................................20

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140 ...............................23

Act of Mar. 14, 1935, ch. 208 § 4, 1935 S.D. Sess. Laws 355 ...............................................20

Act of Mar. 23, 1935, ch. 172, § 4, 1935 Wash. Sess. Laws 599 ............................................20

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 ...............................................................23

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ..............................................23

Act of Mar. 27, 1879, ch. 155, § 8, 16, Del. Laws 225 (1879) ...............................................23

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ....................................................23

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86............................................................23

Act of May 1777, ch. 3, *in 9 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1821) ..............................10

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656............................................................23

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 .............................................................23

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2 ....................................................23

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 .......................................................23

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 .........................................23

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67........................................23

*A System of Civil and Criminal Law for the District of Columbia, and for the Organization of the Courts Therein,* S. Doc. No. 85, 22d Cong., 1st Sess. 308-309, 328, 340, 388 (1833) ....................................18

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction 48 (1998)*  19

*Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law,* 35 Cardozo L. Rev. 1 (2013) .........................................................................................14

Edward Livingston, *A System of Penal Law for the State of Louisiana* (1824)........................ 17, 18

Elon H. Moore, *The Livingston Code*, 19 J. Am. Inst. Crim. L. & Criminology (1928)............................17

Ky. Gen. Stat. ch. 29, Art. 29, § 1 (Edward I. Bullock & William Johnson eds., 1873) ........................23

Letter from George Washington to Nicholas Cooke (Jan. 6, 1776), *in* 3 *The Writings of George Washington* 323 (Worthington Chauncey Ford ed., 1889) ......................................................................17

Letter from John Marshall to Edward Livingston (Oct. 24, 1825), *available at* https://perma.cc/7A6W-GXK5 ..........................................................................................................18

Miss. Rev. Code ch. 77, § 2964 (1880) .......................................................................................................

Resolution of July 25-26, 1776, *in* 1 *American Archives: Fifth Series* (Peter Force ed., 1843) ..................16

Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776* (1776)..............16

Resolutions of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* (1842) .......................................................................16

S. Rep. No. 90-1097 (1968) .........................................................................................................................2

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008) ............16

Stuart Banner, *The Death Penalty: An American History* (2002) ..................................................................14

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1868) ..........................................................................11

*The Federalist* No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961) ....................................28

## INTRODUCTION

Plaintiff Patrick Atkinson is a convicted felon. For defrauding a client, Atkinson pleaded guilty to felony mail fraud, which is punishable by up to twenty years of imprisonment. *See* 18 U.S.C. § 1341. As a result, Atkinson is prohibited under federal law from possessing a firearm. *See* 18 U.S.C. § 922(g)(1). He contends that prohibition violates the Constitution on its face and applied to him. Atkinson's claims fail as a matter of law.

This Court has correctly held that "the categorical prohibition created by section 922(g)(1)"—which bars felons from possessing firearms—"passes muster under the Constitution," regardless of whether a particular felon has a "history of violence or use of force." *United States v. Donald*, No. 20-CR-832, 2024 WL 2018630, at *2, *4 (N.D. Ill. May 6, 2024) (quoting *Atkinson v. Garland*, 70 F.4th 1018, 1025 (7th Cir. 2023) (Wood, J., dissenting)).[1] For the reasons explained below, that same analysis determines that Atkinson's claims that Section 922(g)(1) is unconstitutional on its face and as applied to him fail as a matter of law. Moreover, the Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), reinforces the validity of this Court's approach to Second Amendment claims brought by felons such as Atkinson. Accordingly, the Court should grant Defendants' renewed motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[1] *Accord United States* v. *Cortez-Gomez*, No. 20-CR-422, 2024 WL 2019267, at *2 (N.D. Ill. May 6, 2024); *United States* v. *Greenlee*, No. 22-CR-403, 2024 WL 2019279, at *2 (N.D. Ill. May 6, 2024); *United States* v. *Johnson*, No. 20-CR-926, 2024 WL 2019541, at *2 (N.D. Ill. May 6, 2024); *United States* v. *Leverston*, No. 22-CR-532, 2024 WL 2018279, at *2 (N.D. Ill. May 6, 2024); *United States* v. *McIntosh*, No. 21-CR-188, 2024 WL 2018277, at *2 (N.D. Ill. May 6, 2024); *United States* v. *Nathaniel*, No. 20-CR-399, 2024 WL 2018615, at *2 (N.D. Ill. May 6, 2024); *United States* v. *Rosario*, No. 21-CR-169, 2024 WL 2018937, at *2 (N.D. Ill. May 6, 2024) *United States* v. *Walls*, No. 20-CR-710, 2024 WL 2018624, at *2 (N.D. Ill. May 6, 2024).

## BACKGROUND

I.      **Statutory Background**

In 18 U.S.C. § 922(g)(1), Congress prohibited a person from possessing a firearm in or affecting commerce if he or she has been convicted of a "crime punishable by imprisonment for a term exceeding one year."  Section 922(g)(1) reflects Congress's longstanding recognition that the "ease with which" firearms could otherwise be acquired by "criminals[] . . . and others whose possession of firearms is similarly contrary to the public interest" is "a matter of serious national concern."  S. Rep. No. 90-1097, at 28 (1968).  Congress has explained that "it is not the purpose" of this or similar provisions of federal law "to place any undue or unnecessary Federal restrictions or burdens on lawabiding citizens."  Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 95-351, tit. IV, § 901(b), 82 Stat. 197, 226; Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14.

Section 922(g)(1) is subject to several exceptions, none of which applies here.  The provision does not cover certain offenses "relating to the regulation of business practices."  18 U.S.C. § 921(a)(20)(A).  It also does not cover state offenses that are "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."  *Id.* § 921(a)(20)(B).  And it does not cover convictions that have "been expunged, or set aside or for which a person has been pardoned or has had civil rights restored."  *Id.* § 921(a)(20).

Until 1992, Congress also allowed an individual to obtain relief from Section 922(g)(1)'s prohibition on firearm possession by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that "the circumstances regarding the disability, and [his or her] record and reputation, are such that [he or she] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."  18 U.S.C. § 925(c); *see also* 27 C.F.R. § 478.144(d) (delegating authority to the Director of ATF).  But since 1992, Congress

2

has effectively suspended that provision by prohibiting the use of federal funds to process applications for relief. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

## II.    Factual Background

Atkinson pleaded guilty in 1998 to felony mail fraud, Am. Compl. ¶ 7, ECF No. 26—a crime punishable by up to twenty years of imprisonment, *see* 18 U.S.C. § 1341.  At the time of that offense, Atkinson owned an executive recruiting firm that collected fees from companies that hired candidates Atkinson recommended.  Am. Compl. ¶ 8.  Atkinson defrauded a client company by paying a company insider involved in hiring one of his candidates.  *Id.* ¶¶ 9-13.  As punishment, Atkinson was sentenced to six months of home confinement, two years of probation, and a $15,000 fine.  *Id.* ¶ 14.  He also paid $45,000 to settle a civil fraud claim brought by the company he defrauded.  *Id.* ¶ 13.  As a result of his federal felony conviction, Atkinson is subject to Section 922(g)(1)'s prohibition on the possession of firearms.  *Id.* ¶ 15.

## III.    Procedural Background

Atkinson filed this action on January 18, 2021, alleging that Section 922(g)(1) is unconstitutional as applied to him and seeking declaratory and injunctive relief.  Compl. ¶¶ 33-48 & 10-11, ECF No. 1.  Defendants filed a motion to dismiss the complaint pursuant to Rule 12(b)(6), ECF No. 6, which the Court granted, ECF No. 14.

Atkinson appealed, and while his appeal was pending, the Supreme Court decided *NYSRPA v. Bruen*, 597 U.S. 1 (2022).  As relevant here, the Court clarified in *Bruen* that means-end scrutiny does not apply in the Second Amendment context.  *Id.* at 19.  Rather, text and history alone determine the scope of the Second Amendment's protections.  *Id.*

Because this Court had relied in part on then-governing precedent that applied means-ends scrutiny, and not solely on the text-and-history inquiry that *Bruen* clarified is the only relevant standard in the Second Amendment context, a divided panel of the Seventh Circuit decided to remand for this

3

Court to apply the *Bruen* standard in the first instance. *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023). Judge Wood dissented, reasoning that remand was unnecessary and that the Court instead should have held that "the categorical prohibition created by section 922(g)(1) passes muster under the Constitution" in light of the Second Amendment's text and history. *Id.* at 1025 (Wood., J., dissenting). The majority did not dispute the substance of Judge Wood's analysis; to the contrary, the panel explicitly stated that, on remand, this Court may rely on "the analysis embodied in [Judge Wood's] opinion," among other potentially relevant sources. *Id.* at 1024. But the majority determined that both parties' briefing in the court of appeals, which was submitted in the immediate aftermath of the *Bruen* decision, "f[ell] short" of the required historical analysis. *Id.* at 1022-23. The majority therefore concluded that remand was warranted to provide both parties "a full and fair opportunity to develop their positions . . . in accordance with the principles of party presentation." *Id.* at 1023. The Seventh Circuit also identified five "interrelated and non-exhaustive questions [that] may help focus the proper analysis on remand." *Id.*; *see infra* pages 30-32.

On remand, Atkinson amended his complaint to challenge Section 922(g)(1) both on its face and as applied to him. Am. Compl. ¶¶ 33-46. On November 2, 2023, Defendants filed a motion to stay proceedings pending action in the Supreme Court on then-pending challenges to 18 U.S.C. § 922(g)(1), at issue here, and 18 U.S.C. § 922(g)(8), which disarms individuals subject to domestic violence protective orders. ECF No. 27. The Court granted Defendants' stay motion. ECF No. 31. On May 1, 2024, the Court lifted the stay and directed Defendants to respond to Atkinson's amended complaint. ECF No. 33. Defendants now move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), a complaint must include sufficient factual allegations to show a plausible right to relief, *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007). When considering whether the complaint demonstrates a plausible right to relief, the Court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). By contrast, "legal conclusions and conclusory allegations . . . are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Applying these standards, if the Court finds that the complaint does not show a plausible right to relief, then the Court should grant the moving party's motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The right to bear arms is thus "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634-35. In particular, as relevant here, that right "extended (and thus extends) to some categories of individuals, but not others." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022).

When the validity of a firearm restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, to discern whether the restriction is consistent with the constitutional "principles" the define the scope of the Amendment, *Rahimi*, 144 S. Ct. at 1898.

Binding precedent establishes that Section 922(g)(1) is constitutional on its face. Two independent but mutually reinforcing principles support that conclusion and confirm that Section 922(g)(1) also is constitutional as applied to Atkinson. First, felons disqualified from possessing firearms under Section 922(g)(1) are not among "the people" protected by the Second Amendment. Second, the Second Amendment has not historically been understood to protect convicted felons.

Additionally, history confirms that Congress may disarm felons on a categorical basis, without individualized assessments. At a minimum, the seriousness of Atkinson's felony fraud offense makes clear that Section 922(g)(1) is constitutional as applied to him, even to the extent that Section 922(g)(1) may ever violate the Second Amendment as applied.

## I.  Binding Precedent Establishes That Section 922(g)(1) Is Facially Constitutional.

As the Seventh Circuit has recognized, any argument that Section 922(g)(1) violates the Second Amendment is, at best, "hard to square" with binding Supreme Court precedent. *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). In *Gay*, which was decided after the court of appeals remanded this action for further proceedings in this Court, the Seventh Circuit affirmed the constitutionality of Section 922(g)(1) over a challenge brought by a felon-parolee. Like the Seventh Circuit in *Gay*, this Court has correctly held that the Supreme Court's decision in *Bruen* "leaves unchanged prior case law upholding the constitutionality of § 922(g)(1)." *Donald*, 2024 WL 2018630, at *2. In doing so, the Court "incorporate[d] by reference . . . the . . . interpretation of Supreme Court precedent that has arisen from other persuasive authorities, each upholding the constitutionality of § 922(g)(1)."[2]

---

[2] *Id.* at *2 n.4 (citing *United States* v. *Jackson*, 69 F.4th 495, 505-06 (8th Cir. 2023), *cert. granted, judgment vacated*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024); *United States* v. *Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023), *cert. granted, judgment vacated*, No. 23-6602, 2024 WL 3259687 (U.S. July 2, 2024); *United States* v. *Whitney*, No. 22-10326, 2024 WL 1429461, at *2 (9th Cir. Apr. 3, 2024); *Vincent* v. *Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023), *cert. granted, judgment vacated*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024); *United States* v. *Dubois*, 94 F.4th 1284, 1292-93 (11th Cir. 2024); *United States* v. *Phillips*, No. 1:22-CR-00596, 2023 WL 9001124, at *14 (N.D. Ill. Dec. 28, 2023)).

As this Court also recognized, its conclusion is consistent with the overwhelming weight of authority since *Bruen*. *Id.* at *4 n.6.

Shortly after deciding *Rahimi*, the Supreme Court granted, vacated, and remanded several decisions in Section 922(g)(1) cases, including *Jackson*, *Cunningham*, and *Vincent*. In employing this procedure, commonly known as a "GVR," the Court expressed no view on the merits of those petitions for certiorari. *See, e.g., Tyler* v. *Cain*, 533 U.S. 656, 666 n.6 (2001). Accordingly, such vacatur does not diminish the persuasive force of the out-of-Circuit decisions on which this Court has relied.

In *Heller*, the Supreme Court held that the Second Amendment protects the right to keep and bear arms for self-defense. 554 U.S. at 636. The Court explained, however, that this right "is not unlimited." *Id.* at 626. In particular, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* It described felon-disarmament laws—along with laws disarming persons with mental illnesses, laws excluding firearms from sensitive places, and laws regulating firearms sales—as "presumptively lawful regulatory measures." *Id.* at 627 n.26; *see id.* at 626-27. The Court stated that those "exceptions" to the right had "historical justifications," which the Court would have "time enough to expound upon" "if and when those exceptions come before" it. *Id.* at 635.

*Heller*'s approval of felon-disarmament laws rested on the Supreme Court's evaluation of the historical record. Justices have emphasized that the Court in *Heller* "recognized that history supported the constitutionality" of laws "prohibiting possession by felons." *NYSRPA v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., dissenting). That is, the Court determined that the "traditional exceptions to the right" include "'longstanding prohibitions on the possession of firearms by felons.'" *Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring); *see Heller v. District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* affirmatively *approved* a slew of gun laws," including "felon-in-possession laws," "based on a history-and-tradition-based test . . . .").

*Heller*'s approval of felon disarmament constitutes binding precedent. "In the American system of *stare decisis*," courts must follow "both the result and the reasoning of a prior decision." *Ramos v. Louisiana*, 590 U.S. 83, 125 n.6 (2020) (Kavanaugh, J., concurring in part); *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66-67 (1996). *Heller*'s approval of felon disarmament was essential to its result: The Supreme Court ruled that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights," meaning that he was "not a felon" and "not insane." 554 U.S. at 631, 635. And *Heller*'s discussion of the limits of the right to possess

arms also formed an important part of its reasoning: It showed that reading the Second Amendment to protect an individual right would not imperil longstanding and widespread firearm laws. *See id.* at 626-28.

The Supreme Court's later decisions reinforce this understanding of the Second Amendment. In *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), a plurality of the Court repeated the *Heller* Court's "assurances" that nothing in its holding casts doubt on "such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *Id.* at 786 (citation omitted). In *Bruen*, two Justices reiterated *Heller*'s approval of "longstanding prohibitions on the possession of firearms by felons." 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring). Another Justice emphasized that *Bruen* did not "disturb[] anything that [the Supreme Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72 (Alito, J., concurring). And three other Justices described *Heller*'s discussion of felon disarmament as an "aspect of *Heller*'s holding." *Id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, J.J., dissenting).

More recently, in *Rahimi*, the Supreme Court—in an eight-Justice majority opinion—repeated *Heller*'s statement that laws disarming "felons" are "presumptively lawful," and it relied on that statement in concluding that the Second Amendment permits some regulations banning the possession of firearms in the home. *Rahimi*, 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26). Supreme Court precedent thus establishes that Section 922(g)(1) complies with the Second Amendment.

## II. Felons, As A Class, Are Not Among "The People" Protected By The Second Amendment.

Moreover, text and history confirm that regulations disarming felons, including Atkinson, are consistent with the Second Amendment, in part because felons are not among "the people" protected by the Amendment. *See Voisine v. United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting)

(linking *Heller*'s approval of felon disarmament with the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"); *cf. Donald*, 2024 WL 2018630, at *1 n.1 (assuming without deciding "that convicted felons constitute part of the 'people' under the plain text of the Second Amendment").

At the Founding, the word "people" meant "those who compose a community." 2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); *see* 2 Noah Webster, *An American Dictionary of the English Language* (1828) ("[t]he body of persons who compose a community"). Consistent with that definition, the Constitution generally uses the term "people" as a term of art to refer to "persons who are part of a national community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). The Second Amendment, in particular, uses "people" to refer only to "members of the political community," not to all persons. *Heller*, 554 U.S. at 580. The Amendment thus differs from other constitutional provisions, such as the Due Process and Equal Protection Clauses, that guarantee rights to any "person" regardless of whether that person belongs to the polity. *See* U.S. Const. amend. V; amend. XIV, § 1.

This textual limitation accords with the Second Amendment's history. The Founders codified the right to bear arms in part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1890, at 746 (1833). It is therefore unsurprising that a right that was codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, individuals who have been excluded from the political community have also historically been denied the right to bear arms. For instance, noncitizens at the Founding lacked the "rights of members of the polity"; they could not "vote, hold public office, or

serve on juries," and as the Supreme Court confirmed in *Heller*, they also had no "right to bear arms." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998); *Heller*, 554 U.S. at 635.[3] Likewise, today, federal law disarms certain noncitizens—specifically, those who are unlawfully present in the United States, those who have been admitted on nonimmigrant visas (with some exceptions), and those who have renounced U.S. citizenship. *See* 18 U.S.C. § 922(g)(5), (g)(7), (y). Similarly, during the Revolution, several States deprived individuals of the right to vote and hold office, as well as the right to bear arms, if they refused to swear allegiance to the new republic.[4]  Insane persons also have historically lacked the right to vote, hold office, and serve on juries,[5] and the Supreme Court indicated in *Heller* that they are also "disqualified from the exercise of Second Amendment rights." 554 U.S. at 635; *see id.* at 631.

Criminals, too, are among the traditional categories of persons who are not members of the political community and thus do not enjoy the rights that flow from such membership.  That is because an individual who previously belonged to the polity may forfeit that status by violating the social contract that governs the political community.  *See* 1 William Blackstone, *Commentaries on the Laws of England* 300 (10th ed. 1787) (noting that, if "a member of any national community violates the fundamental contract of his association[] by transgressing the municipal law, he forfeits his right to

---

[3] *See, e.g.*, 37 *Annals of Cong.* 86-87 (Dec. 9, 1820) (statement of Sen. Holmes) ("The rights of an American citizen are . . . to elect, be elected, and bear arms in his defence; they are essential, for, divest him of these, and you divest him of citizenship.  He has other essential rights, such as those of property and personal security under the protection of laws fairly administered, but he has these in common with foreigners.").

[4] *See* Act of June 13, 1777, ch. 756, § 3, *in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-113 (James T. Mitchell & Henry Flanders eds., 1903); Act of May 1777, ch. 3, *in* 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821); Act of 1777, ch. 6, § 9, *in* 24 *The Records of North Carolina* 89 (Walter Clark ed., 1905).

[5] *See* 2 Story, § 578, at 53; *Long* v. *Bowen*, 23 S.W. 343, 343 (Ky. 1893); *United States* v. *Haskell*, 26 F. Cas. 207, 210, 212 (C.C.E.D. Pa. 1823) (Washington, J., on circuit).

such privileges as he claims by that contract"); 4 Blackstone 382 ("[H]e who hath thus violated the fundamental principles of government, and broken his part of the original contract between king and people, hath abandoned his connexions with society: and hath no longer any right to those advantages, which before belonged to him purely as a member of the community."). As a leading nineteenth-century scholar explained, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 28-29 (1868); *see Heller*, 554 U.S. at 616 (describing Cooley's treatise as "massively popular").

American legislatures have thus long denied felons the traditional rights of members of the polity, including those expressly secured to "the People" in the Constitution. Under Article I and the Seventeenth Amendment, for example, "the People" elect the House of Representatives and Senate. U.S. Const. art. I, § 2, cl. 1; *see* U.S. Const. amend. XIV, cl. 1. Those provisions guarantee the "right of the people to choose" members of both Houses of Congress. *United States v. Classic*, 313 U.S. 299, 314 (1941). Yet Section 2 of the Fourteenth Amendment confirms that States may deny felons the right to vote, which States have done since the Founding. U.S. Const. amend. XIV, § 2; *see Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); *Green v. Bd. of Elections*, 380 F.2d 445, 450 nn.4-5 (2d Cir. 1967) (Friendly, J.). States also have historically denied felons the right to hold public office. *Spencer v. Kemna*, 523 U.S. 1, 8-13 (1998). And felons have traditionally been disqualified from serving on juries. *See id.* at 9; 3 Blackstone 363-364. Indeed, it remains true today that committing a felony often results in "forfeit[ing] . . . a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).

Legislatures may similarly deny convicted felons the other traditional right of members of the polity: the right to bear arms. The Constitution would make little sense if it allowed legislatures to deny felons the right to vote, *see* U.S. Const. amend. XIV, § 2, yet guaranteed felons the right to possess arms so that they could help "resist tyranny," *Heller*, 554 U.S. at 598.

Moreover, and as noted, the Supreme Court's cases establish that legislatures may disqualify felons from exercising at least some rights that belong to "the people," such as the right to vote. And many other constitutional provisions also use the term "the people" in a manner that excludes felons, who have forfeited the rights that come with membership in the polity. For instance, felons are not among "the people" who adopted the Constitution, *see* U.S. Const. pmbl; "the [p]eople" who are entitled to elect members of Congress, *see* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So, too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

## III.    History And Tradition Confirm That Congress May Disarm Felons, Including Atkinson, On A Categorical Basis.

In any event, this Court has correctly held that, regardless of whether convicted felons are among "the people," history and tradition confirm that Congress may disarm them. *See Donald*, 2024 WL 2018630, at *2 ("Historical analysis confirms Section 922(g)(1)'s constitutionality." (capitalization altered)); *id.* at *2 n.4 (citing *Jackson*, 69 F.4th at 505-06; *Cunningham*, 70 F.4th at 506; *Whitney*, 2024 WL 1429461, at *2; *Vincent*, 80 F.4th at 1200; *Dubois*, 94 F.4th at 1292-93; *Phillips*, 2023 WL 9001124, at *14) ("incorporat[ing] by reference . . . the historical review . . . that has arisen from other persuasive authorities, each upholding the constitutionality of § 922(g)(1)"). Indeed, the Court has properly "adopt[ed] the well-reasoned historical review and legal analysis of Circuit Judge Wood in her dissent" from the majority's disposition of this case on appeal. *Id.* at *2 (citing *Atkinson*, 70 F.4th at 1025 (Wood, J., dissenting)). That analysis expressly confirms that, upon consideration of text, history, and

12

tradition, this Court was correct to dismiss this action and thus should do so again on remand. *See Atkinson*, 70 F.4th at 1038 (Wood, J., dissenting) ("I am fully satisfied, based on what I have addressed here and on the Supreme Court's own use of history in *Bruen*, that 18 U.S.C. § 922(g)(1) is constitutional as written. I therefore would not remand this case to the district court. I would instead affirm its judgment and uphold the statute.")

A law that regulates conduct covered by the Second Amendment's text complies with the Amendment if it fits within "the Nation's historical tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1896 (quoting *Bruen*, 597 U.S. at 24). Four types of historical evidence show that Section 922(g)(1) does so. *First*, the standard penalty for felonies in the Founding era consisted of death, forfeiture of all the felon's real and personal property, and extinction of all the felon's civil and political rights—deprivations far more severe than that imposed by Section 922(g)(1). *Second*, some Founding-era laws disarmed individuals upon conviction even for non-capital crimes. *Third*, felon-disarmament laws like Section 922(g)(1) are themselves sufficiently "longstanding" to form part of the Nation's tradition of firearm regulation. *Heller*, 554 U.S. at 626. *Fourth*, legislatures have long disarmed categories of persons that pose a danger of misusing firearms, and Section 922(g)(1) rests on such a categorical judgment.

### A. Founding-Era Criminal Punishments More Severe Than Disarmament

"[D]eath was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (citation omitted). That penalty extended even to non-violent crimes. For example, the First Congress made forgery a capital offense. *See* Act of April 30, 1790, ch. 9, § 14, 1 Stat. 115. "Virginia imposed the death penalty for all sorts of crimes relating to the tobacco trade—including embezzling tobacco, fraudulently delivering tobacco, altering inspected tobacco, forging inspectors' stamps, and smuggling tobacco—as well as for stealing hogs (upon a third conviction), receiving a stolen horse, and concealing property to

defraud creditors." Stuart Banner, *The Death Penalty: An American History* 8 (2002). New York imposed the death penalty for counterfeiting; Pennsylvania, for squatting on Indian land; Delaware, for stealing £5 from a house; and South Carolina, for burning timber intended for house frames. *See id.* The New England colonies invoked the death penalty more sparingly, but even they imposed it for property crimes such as burglary and robbery. *See id.* at 7-8.

At common law, felons generally also forfeited their lands, goods, and chattels. *See* 4 Blackstone 380-389. That rule—which reflected the belief that "property was a right derived from society which one lost by violating society's laws," *Austin v. United States*, 509 U.S. 602, 612 (1993)—took hold in the colonies. *See* Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 35-41 (2013). The middle and southern colonies were especially "receptive to English common law traditions regarding criminal forfeiture, enacting only minor statutory exceptions." *Id.* at 37. The New England colonies, by contrast, were more "active in their attempts to modify the English common law by statute," although "even these colonies ultimately accepted forfeiture." *Id.* at 35; *see, e.g., id.* (explaining that Massachusetts abolished forfeiture in 1641 but restored it by the end of the century).

Finally, a felon who was sentenced to death was deemed "already dead in law" even before his execution. 4 Blackstone 380; *see Troup v. Wood*, 4 Johns. Ch. 228, 248 (N.Y. Chancery 1820) (Kent, Ch.). That status, known as civil death, involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, to marry, and [to] hold office." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Section 922(g)(1) is "'relevantly similar'" to those Founding-era laws "in both why and how it burdens the Second Amendment right." *Rahimi*, 144 S. Ct. at 1901. As for why: Section

922(g)(1), like the Founding-era laws discussed above, applies because an individual has been convicted of a felony. As for how: The burden imposed by Section 922(g)(1) is far more modest than those imposed by Founding-era criminal laws. If legislatures at the Founding could deprive convicted felons of the right to life, the right to own property, and all other civil and political rights, then legislatures today certainly may deprive them of the right to possess firearms.

The Supreme Court's decision in *Rahimi*—in which the Court upheld 18 U.S.C. 922(g)(8), the statute that temporarily disarms persons subject to domestic-violence restraining orders—reinforces that analogy. In *Rahimi*, the Court analogized Section 922(g)(8) to historical "going armed" laws, which forbade menacing others with firearms. *See id.* at *8-9. "The going armed laws provided for imprisonment," the Court explained, "and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* at *14-15. Similarly, because capital punishment and the denial of all civil and political rights were permissible to respond to the commission of a felony, the lesser restriction of disarmament is also permissible. The *Rahimi* Court observed, in addition, that the going armed laws punished offenders with forfeiture of their arms. *See id.* at *13. If the forfeiture of an offender's arms is analogous to temporary disarmament, then the forfeiture of the offender's entire estate is analogous to permanent disarmament.

The criminal laws of the Founding era subjected convicted felons to severe deprivations: death, forfeiture of all property, and total loss of civil and political rights. Because Section 922(g)(1) imposes a far more modest restriction than those laws, it complies with the Second Amendment.

## B. Founding-Era Laws Disarming Convicted Criminals

Because death was the "standard penalty for all serious crimes" at the Founding, *Bucklew*, 587 U.S. at 129 (citation omitted), early legislatures had little occasion to consider whether to disarm convicted criminals who were not executed. But the available historical evidence shows that

legislatures were understood to possess the power to disarm those individuals. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) ("[The] exclusion of criminals from the individual right to keep and bear arms . . . was understood.").

To begin, several colonies enacted such disarmament laws during the Revolution. A New York law provided that a person would "be disarmed" upon conviction for furnishing provisions to the British army or for opposing the authority of the Continental Congress. Resolutions of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842). A South Carolina law provided that a person would "be disarmed" upon "due conviction" for bearing arms against, or opposing the measures of, the Continental Congress. Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776*, at 77 (1776). Hampshire County, Massachusetts, ordered that "all persons that shall be convicted of being notoriously inimical to the cause of American Liberty, be disarmed." Resolution of July 25-26, 1776, *in* 1 *American Archives: Fifth Series* 588 (Peter Force ed., 1843) (emphasis omitted). And a Connecticut law provided that anyone "duly convicted" of seditious libel "shall be disarmed and not allowed to have or keep any arms." Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193 (Charles J. Hoadly ed., 1890). George Washington discussed the Connecticut law, including its "penalty of being disarmed," in a letter to the Governor of Rhode Island, adding that "the other colonies ought to adopt similar" measures. Letter from George Washington to Nicholas Cooke (Jan. 6, 1776), *in* 3 *The Writings of George Washington* 323 (Worthington Chauncey Ford ed., 1889).

The principle that legislatures could properly disarm convicted criminals persisted after the Revolution. At Pennsylvania's ratifying convention, Anti-Federalists proposed a bill of rights that, among other things, would have prohibited "disarming the people, or any of them, *unless for crimes committed*, or real danger of public injury from individuals." 2 *The Documentary History of the*

16

*Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists, who considered a bill of rights unnecessary, defeated the proposal, but the Anti-Federalists published it in the "highly influential" Dissent of the Minority of the Convention. *Heller*, 554 U.S. at 604; *see id.* at 624. "Given the Anti-Federalists' vehement opposition" to federal power, *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 664 (2013) (Thomas, J., concurring), it is telling that even they accepted the disarmament of convicted criminals.

Evidence from the early nineteenth century confirms that the Second Amendment was understood to permit the disarmament of convicted criminals. In the early 1820s, the Louisiana State Legislature appointed Edward Livingston—"one of our great lawyers," *Green v. United States*, 356 U.S. 165, 213-214 (Black, J., dissenting)—to draft a systemic code of criminal law for the State. *See* Elon H. Moore, *The Livingston Code*, 19 J. Am. Inst. Crim. L. & Criminology 344, 345, 354 (1928). Livingston's proposed code abolished the death penalty, but listed the "suspension" and permanent "forfeiture" of "political or civil rights" among the punishments that courts could impose. Edward Livingston, *A System of Penal Law for the State of Louisiana* 26-27 (1824). The "civil rights" that could be suspended or forfeited included the "right of bearing arms in defence of the country." *Id.* at 29. For example, the code authorized courts to impose one year of imprisonment and five years of disarmament for fraudulent interference with an inheritance, *see id.* at 138; seven years of imprisonment and permanent disarmament for perjury, *see id.* at 49, and fifteen years of imprisonment and permanent disarmament for forgery, *see id.* at 73.

Livingston later proposed a similar penal code for the United States, and he included similar provisions concerning forfeiture of the right to bear arms. *See* Edward Livingston, *A System of Penal Law for the United States* 19-20, 40, 79, 126 (1828). A congressional committee also copied much of Livingston's work, including its provisions concerning forfeiture of the right to bear arms, in a draft criminal code for the District of Columbia. *See A System of Civil and Criminal*

17

*Law for the District of Columbia, and for the Organization of the Courts Therein*, S. Doc. No. 85, 22d Cong., 1st Sess. 308-309, 328, 340, 388 (1833).

Livingston's proposals won wide acclaim, including from Jefferson, Madison, and Story. *See* Moore, *supra*, at 355. Chief Justice Marshall, who read the proposed code "with attention and interest," wrote to Livingston: "Among your penalties a deprivation of civil and political rights is frequently introduced. I believe no former legislator has relied sufficiently on this provision; and I have strong hopes for its efficacy." Letter from John Marshall to Edward Livingston (Oct. 24, 1825), *available at* https://perma.cc/7A6W-GXK5. Chief Justice Marshall evidently did not believe that those deprivations raised any constitutional concerns.

Although Livingston's codes ultimately were not adopted, the Supreme Court and Justice Scalia have cited their provisions as evidence of the types of laws that would have been considered permissible at the Founding. *See Beauharnais v. Illinois*, 343 U.S. 250, 255 n.4 (1952); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 294 (1990) (Scalia, J., concurring). Here, the codes suggest that legislatures were understood to possess the power to disarm convicted criminals.

To sum up: The colonies disarmed certain convicted criminals before ratification; even the Anti-Federalists accepted the disarmament of convicted criminals during ratification; and leading lawyers saw no constitutional problem with disarming convicted criminals after ratification. The Second Amendment's original meaning allows Congress to disarm convicted criminals.

### C. Longstanding And Widespread Felon-Disarmament Laws

Laws prohibiting convicted criminals from possessing firearms are themselves sufficiently "longstanding" to form part of the Nation's tradition of firearm regulation. *Heller*, 554 U.S. at 626. To begin, the United States has a century-old tradition of disarming *violent* criminals (regardless of whether their crimes constitute felonies). In the 1920s and 1930s, multiple

18

jurisdictions began prohibiting anyone with a conviction for a "crime of violence" from possessing a handgun.[6]  In 1932, Congress adopted a similar prohibition for the District of Columbia.  *See* District of Columbia Dangerous Weapons Act, § 3, 47 Stat. 650, 651.  And in 1938, Congress enacted a nationwide prohibition on the receipt of a firearm by anyone with a conviction for a crime of violence.  *See* Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1250, 1251 (1938).  Those early "crime of violence" laws did not distinguish between violent felonies and violent misdemeanors.  *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), *cert. denied*, 562 U.S. 1303 (2011).

The United States also has a century-old tradition of disarming convicted *felons* (regardless of whether their crimes are violent).  In the 1920s and 1930s, legislatures began to prohibit the possession of handguns by those who had been convicted of felonies against person or property (a category that included nonviolent property crimes such as theft).[7]  At around the same time, other legislatures began to prohibit the possession or purchase of handguns by felons in general.[8] Congress followed the latter model in 1961, when it forbade the receipt of a firearm by anyone convicted of a crime punishable by more than a year of imprisonment.  *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §2, 75 Stat. 757.  And in 1968, Congress enacted Section 922(g)(1), broadening

---

[6] *See* Act of Apr. 22, 1927, ch. 1052, § 3, 1927 R.I. Acts & Resolves 257; Act of Apr. 27, 1927, No. 206, § 4, 1927 Haw. Terr. Sess. Laws 209; Act of June 10, 1931, No. 158, § 4, 1931 Pa. Sess. Laws 498; Act of Mar. 14, 1935, ch. 208 § 4, 1935 S.D. Sess. Laws 355; Act of Mar. 23, 1935, ch. 172, § 4, 1935 Wash. Sess. Laws 599; Act of Apr. 6, 1936, No. 82, § 4, 1936 Ala. Gen. Laws 51.

[7] *See* Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380; Act of May 4, 1923, ch. 119, § 3, 1923 N.H. Laws 138; Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696; Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468; Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-96.

[8] *See* Act of Mar. 5, 1925, ch. 47, § 2, 1925 Nev. Laws 54; Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323; Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-888; Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316.

that prohibition to cover possession as well as receipt. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220.

Today, at the federal level, Section 922(g)(1) is by far the most commonly applied firearm disqualification in Section 922(g). In addition, every single State and territory has enacted some form of felon-disarmament law—*i.e.*, a law that disqualifies individuals from possessing, carrying, or buying firearms because of felony convictions. Thirty-nine States, the District of Columbia, and five territories, have enacted felon-disarmament laws that cover felony convictions in general.[9] Felon-disarmament laws in the remaining eleven States cover specific types of crimes, such as violent crimes or drug crimes.[10]

The century-old, nationwide tradition of disarming convicted felons (including non-violent felons) resolves this case. Although post-ratification evidence cannot overcome clear constitutional text, "the Framers themselves intended that post-ratification history would shed

---

[9] *See* Alaska Stat. Ann. § 11.61.200(a)(1); Am. Samoa Code Ann. § 46.4221(b)(1); Ariz. Rev. Stat. Ann. § 13-904(A)(5); Ark. Code Ann. § 5-73-103(a)(1); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-108(1); Conn. Gen. Stat. § 53a-217(a); Del. Code Ann. tit. 11, § 1448(a)(1); D.C. Code Ann. § 22-4503(a)(1); Fla. Stat. Ann. § 790.23(1); Ga. Code Ann. § 16-11-131(b); Haw. Rev. Stat. § 134-7(b); 10 Guam Code Ann. § 60108(b)(1); 720 Ill. Comp. Stat. 5/24-1.1(a); Ind. Code Ann. § 35-47-2-3(i)(1); Iowa Code Ann. § 724.26(1); Ky. Rev. Stat. Ann. § 527.040(1); Me. Rev. Stat. Ann. tit. 15, § 393(1)(A-1)(1); Md. Code Ann. Pub. Safety §§ 5-101(g)(2), 5-133(b)(1); Mass. Gen. Laws Ann. ch. 140, § 129B(1)(i)(A) and (ii)(A); Mich. Comp. Laws Ann. § 750.224f(1); Minn. Stat. Ann. § 624.713, subdiv. 1(10)(i); Miss. Code Ann. § 97-37-5(1); Mo. Rev. Stat. § 571.070.1(1); Neb. Rev. Stat. Ann. § 28-1206(1)(a)(i); Nev. Rev. Stat. Ann. § 202.360.1(b); N.H. Rev. Stat. Ann. § 159:7; N.J. Stat. Ann. § 2C:58-3(c)(1); N.M. Stat. Ann. § 30-7-16(A); N.Y. Penal Law § 400.00(1)(c); N.C. Gen. Stat. Ann. § 14-415(b)(5); N.D. Cent. Code Ann. § 62.1-2-1(1)(b); 6 N. Mar. I. Code § 10610(a)(3); Okla. Stat. Ann. tit. 21, § 1283(A); Or. Rev. Stat. Ann. § 166.270(1); P.R. Laws Ann. tit. 25, § 462a(a)(2); Tenn. Code Ann. § 39-17-1307(c); Tex. Penal Code Ann. § 46.04(a); Utah Code Ann. § 76-10-503(1); Va. Code Ann. § 18.2-308.2(A)(i); V.I. Code Ann. tit. 23, § 456a(a)(1); Wash. Rev. Code Ann. § 9.41.040(2)(a)(i)(A); W. Va. Code Ann. § 61-7-7(a)(1); Wis. Stat. Ann. § 941.29(1m)(a)-(b); Wyo. Stat. Ann. § 6-8-102(c).

[10] *See* Ala. Code § 13A-11-72(a)(1); Idaho Code Ann. § 18-310(2); Kan. Stat. Ann. § 21-6304(a); La. Stat. Ann. § 14:95.1(A); Mont. Code Ann. § 45-8-313(1); Ohio Rev. Code Ann. § 2923.13(A)(2)-(3); 18 Pa. Stat. & Cons. Stat. Ann. § 6105(a)(1) and (b); 47 R.I. Gen. Laws Ann. § 11-47-5(a)(1); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 22-14-15; 13 Vt. Stat. Ann. § 4017(a).

light on the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917(Kavanaugh, J., concurring). And the Supreme Court has often relied on post-ratification history, including history from long after the Founding, in resolving constitutional ambiguities. *See, e.g., City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022) ("[F]or the last 50-plus years, federal, state, and local jurisdictions have repeatedly relied upon on-/off-premises distinctions."); *NLRB v. Noel Canning*, 573 U.S. 513, 533 (2014) ("[T]hree-quarters of a century of settled practice is long enough."); *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 66 (2019) ("[T]he Cross . . . has stood undisturbed for nearly a century."); *Dep't of Revenue v. Davis*, 553 U.S. 328, 342 (2008) ("[T]he Davises would have us invalidate a century-old taxing practice . . . presently employed by 41 States.").

The tradition of disarming convicted felons carries added force here because it is not only a century old, but also widespread. "Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (citation omitted) (Scalia, J.). As a result, a law that "has the validation of long, accepted usage" and that "has become general throughout the United States" "bears a strong presumption of constitutionality," *Doe v. Reed*, 561 U.S. 186, 221 (2010) (Scalia, J., concurring in the judgment) (citation omitted). Such a "universal and long-established" practice should take precedence over "historical and academic speculations" about what inferences to draw from an inconclusive Founding-era record. *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 377 (1995) (Scalia, J., dissenting).

### D. Laws Disarming Dangerous Persons On A Categorical Basis

The United States, finally, has a longstanding tradition of disarming persons whose possession of firearms poses a danger to themselves or others. *Rahimi* involved one aspect of that tradition: disarmament based on a court's finding that a particular individual poses such a danger.

21

*See Rahimi*, 144 S. Ct. at 1896. This case involves another aspect of that tradition: disarmament of "categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901; *see Vidal v. Elster*, 602 U.S. 286, 319 (2024) (Barrett, J., concurring in part and concurring in the judgment) ("Congress is entitled to make categorical judgments, particularly when heightened scrutiny does not apply."); *Skoien*, 614 F.3d at 640 ("That *some* categorical limits are proper is part of the original meaning [of the Second Amendment] . . . .").

Throughout the nineteenth century, American legislatures disarmed classes of individuals who posed a danger of misusing firearms. At least twenty-nine jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[11] Several States banned the sale of firearms to persons of unsound mind.[12] At least a dozen States disarmed

---

[11] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[12] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

"tramps"—that is, vagrants.[13]   And some States forbade intoxicated persons from buying or carrying firearms.[14]

State courts upheld those laws, even though the laws did not require an individualized assessment of danger.  The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms."  *State v. Shelby*, 2 S.W. 468, 469 (1886).  And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others."  *State v. Hogan*, 58 N.E. 572, 575 (1900).

The tradition of making such categorical judgments continued into the twentieth century.  In the 1930s, Congress disqualified fugitives and persons under felony indictment.  *See* Federal Firearms Act, ch. 850, § 2(e)-(f), 52 Stat. at 1251.  In the 1960s, Congress disqualified drug users, drug addicts, and persons with mental illnesses.  *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. at 1220.  In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces.  *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452 (1986).  And in the 1990s, it disarmed domestic-violence misdemeanants.  *See* Omnibus

---

[13] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[14] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. VI, § 658(b)(2), 110 Stat. 3009, 3009-372. In short, legislatures' power to make categorical judgments about danger is one of "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. By committing a felony offense, "a felon has shown manifest disregard for the rights of others," and his continued "possession of firearms would . . . threaten the security of his fellow citizens." *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). It is therefore unsurprising that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011), *overruled in part by Binderup v. Att'y Gen.*, 836 F.3d 336, 349-50 (3d Cir. 2016). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup*, 836 F.3d at 400 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments), *cert. denied*, 582 U.S. 943 (2017); *see id.* at 400 n.160 (collecting studies). And the Supreme Court has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983); *see, e.g.*, *Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons.").

To reject Atkinson's as-applied challenge, this Court need only recognize that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year. In interpreting other provisions of the Bill of Rights that require courts to distinguish among different types of crimes, the traditional focus has been on the "maximum authorized penalty"—which "provides an objective indication of the seriousness with which society regards the offense"—rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (alteration and

quotation marks omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989). A similar approach is appropriate in interpreting the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quotation marks omitted).

In particular, when a person has been convicted of a crime punishable by more than one year of imprisonment, a court need not inquire further into the nature of the crime in order to determine whether disarmament is justified. Rather, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament.

**IV.    To The Extent That As-Applied Challenges To Section 922(g)(1) May Be Available, Atkinson's Challenge Fails In Light Of The Seriousness Of Felony Fraud And The Dangerousness Of Even Non-Violent Felons.**

For the foregoing reasons, precedent, text, and history all confirm that Section 922(g)(1) is constitutional in every application. But even "assum[ing] for the sake of argument" that the foregoing analysis leaves "*some* room for as-applied challenges," *Gay*, 98 F.4th 843, 846 (7th Cir. 2024), Atkinson's as-applied challenge fails because fraud is an indisputably serious crime. At a minimum, the textual and historical analysis set forth above makes clear that at least two principles supporting felon disarmament are well established in the Nation's historical tradition: (1) legislatures may disarm individuals who have committed serious crimes, and (2) legislatures may disarm individuals whose possession of firearms would endanger themselves or others.

Each of these principles provides an ample, independent basis for disarming Atkinson. The Seventh Circuit has recognized that the precise crime of which Atkinson is guilty is "a serious federal

felony for conduct broadly understood to be criminal." *Kanter v. Barr*, 919 F.3d 437, 450 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. 1 (2022).[15]   Other courts, too, have held that felony fraud is "a serious crime, *malum in se*, that is punishable in every state." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).   "American courts have, without exception, included fraud within the scope of moral turpitude." *Id.* (brackets omitted) (quoting *Jordan v. De George*, 341 U.S. 223, 229 (1951)); *see also, e.g.*, *Hamilton v. Pallozzi*, 848 F.3d 614, 627 (4th Cir. 2017) (affirming that state-law felony convictions for credit card fraud were "black-letter *mala in se* felonies reflecting grave misjudgment and maladjustment," leaving "no possibility that [the plaintiff] was a law-abiding, responsible citizen" (internal quotation marks and citation omitted)).

Moreover, Congress's determination that the possession of firearms by even non-violent felons creates an unacceptably high risk of danger is well founded.   It is well established that "nonviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders—have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent." *Kanter*, 919 F.3d at 448 (collecting authority) (quoting *Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008)).

Indeed, legislatures have treated fraud offenses similar to Atkinson's as serious crimes for centuries, including by providing for capital punishment in the Founding era.   *See supra* pages 14-15. It follows that the Founders would have regarded the lesser punishment of disarmament as consistent with the Constitution.   *See Rahimi*, 144 S. Ct. at 1902 (reasoning that, if a greater restriction was permissible at the time of the Founding, it follows that a lesser restriction also is permissible).

---

[15] While *Kanter*'s application of means-ends scrutiny has been overtaken by intervening precedent, its conclusions with respect to the serious nature of felony fraud—as well as its bottom-line conclusion— remain sound.

Moreover, to the extent Atkinson predicates his claim on characteristics specific to him, as compared to other felony fraud offenders—whether at the time of his conviction or today—a regime of individualized as-applied challenges to Section 922(g)(1) would be unsound in principle and unworkable in practice. To begin, it would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. If federal courts were to create a system of as-applied exemptions from Section 922(g)(1), they would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. *The Federalist* No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961)

A regime of individualized as-applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, States have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. *See supra* pages 10-13. The Supreme Court has never suggested that a felon can challenge those disabilities on the ground that they do not fit his or her felony or individual circumstances. Courts should not treat the right to possess arms any differently.

And an analogous regime administered by the judiciary would, if anything, be even less feasible than the system of administrative relief that Congress tried and abandoned. Courts, unlike administrative agencies, are not "institutionally equipped for conducting a neutral, wide-ranging investigation" into every individual circumstance that might bear on how much danger a given felon

poses with firearms. *United States v. Bean*, 537 U.S. 71, 77 (2002) (holding that Congress's appropriations bar precludes judicial review under 18 U.S.C. § 925(c)).

**V.** **The Supreme Court's Decision In *Rahimi* Reinforces This Court's Analysis In *Donald* And Other Recent Cases Rejecting Second Amendment Challenges To Section 922(g)(1), Including As Applied To Non-Violent Felons.**

For the reasons explained above, this Court's conclusion in *Donald* and other recent cases that Section 922(g)(1) is consistent with the Second Amendment, including as applied to non-violent felons, applies with equal force here. After the Court issued those decisions, an eight-Justice majority of the Supreme Court held in *Rahimi* that the Fifth Circuit had erred in concluding that the Second Amendment prevents Congress from disarming individuals subject to domestic violence restraining orders. 144 S. Ct. at 1895. The Supreme Court's decision in *Rahimi* confirms the validity of this Court's analysis in *Donald* and other cases in at least two respects:

*First*, and as noted, the *Rahimi* Court expressly reaffirmed the Court's statement in *Heller* that "many . . . prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902 (citing *Heller*, 554 U.S. 626-27 & n.26); *see supra* page 9. In *Donald* and other recent cases, this Court has relied on the same Supreme Court authority that *Rahimi* reaffirmed to conclude that "controlling case law confirms Section 922(g)(1)'s constitutionality." *Donald*, 2024 WL 2018630, at *1 (capitalization altered); *see also Gay*, 98 F.4th at 845 (citing *Heller*, 554 U.S. 626, 635); *Donald*, 2024 WL 2018630, at *1 (relying on *Gay*).

*Second*, the Court emphasized in *Rahimi* that its decision should not be misinterpreted to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by *categories* of persons thought by a legislature to present a special danger of misuse," even though the particular firearm regulation at issue in *Rahimi* involved individualized assessments by courts. 144 S. Ct. at 1901 (emphasis added) (citing *Heller*, 554 U.S. at 626). That admonition supports this Court's determination that particularized considerations with respect to "an individual's history of violence or

28

use of force" do not determine the constitutionality of Section 922(g)(1) as applied to that individual. *Donald*, 2024 WL 2018630, at *4; *see also supra* pages 28-29. Rather, Congress may disarm felons on a categorical basis because felons, as a group, "present a special danger of misus[ing]" firearms. *Rahimi*, 144 S. Ct. at 1901.

For these reasons, *Rahimi* reinforces the Court's conclusions in *Donald* and other recent cases. And those same conclusions require dismissal of Atkinson's claims here.

* * * * * * * * * *

In sum, with respect to the questions that the Seventh Circuit directed this Court to consider on remand, Defendants have established:

1. *Does § 922(g)(1) address a "general societal problem that has persisted since the 18th century?"* Bruen, 142 S. Ct. at 2131. *If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?"* Id.

The Supreme Court underscored in *Rahimi* that the central inquiry in this context is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898. That regulatory tradition includes punishing individuals who committed serious crimes with more severe penalties than disarmament, including death, estate forfeiture, and civil death; disarming individuals who committed less serious crimes; disarming felons, in particular, on a widespread basis for more than a century; and disarming categories of individuals whose possession of firearms poses a risk to others. *See supra* pages 14-17, 19-25. Taken together, this history establishes that: (1) legislatures may disarm individuals who have committed serious crimes, and (2) legislatures may disarm individuals whose possession of firearms would endanger themselves or others. And those principles, in turn, confirm the constitutionality of Section 922(g)(1), both on its face and applied to Atkinson.

2. *What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1).*

History confirms that legislatures may, at a minimum, disarm those convicted of serious crimes (including all felonies), consistent with the Second Amendment. *See supra* pages 14-17, 19-29. In addition to the historical regulations addressed in response to question (1), the Pennsylvania Anti-Federalists' Dissent of the Minority of the Convention; Livingston's proposed code of criminal law for Louisiana; and contemporary commentary thereof further reinforce that the Founders regarded disarmament of criminals generally and of felons in particular as constitutional. *See supra* pages 17-19.

3. *Are there broader historical analogues to § 922(g)(1) during the periods that* Bruen *emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1).*

Yes. The United States has a longstanding tradition of disarming categories of persons whose possession of firearms poses a danger to themselves or others—including, historically, individuals under a particular age; persons of unsound mind; vagrants; and intoxicated persons—without any requirement of an individualized finding of danger. This tradition further underscores the constitutionality of disarming felons such as Atkinson, because felons, as a group, pose a special danger of misuse of firearms. *See supra* pages 22-29.

4. *If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.*

Yes. Each of the traditions noted above constitutes a consensus view throughout American history—as reflected, for example, in treatises popular with the Founding generation. *See supra* page 11; *see generally* pages 14-26.

5. *If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements?* Bruen *shows that these distinctions should also have firm historical support. See 142 S. Ct. at 2132-33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).*

History does not support Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies. As noted, the United States has long disarmed dangerous people on a categorical basis, without individualized consideration of a particular person's characteristics. Moreover, a regime of individualized as-applied challenges to Section 922(g)(1) would be unsound in principle and unworkable in practice. And even if as-applied challenges were available, Atkinson's challenge would fail because felony fraud has always been recognized as a serious crime, and Congress reasonably determined that the possession of firearms by even non-dangerous felons creates an unacceptable risk of danger. *See supra* pages 26-29.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss Atkinson's amended complaint and dismiss Atkinson's claims with prejudice.

31

Dated: July 15, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
New York Bar No. 5859137
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 514-3786
Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*